FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| REGINA TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 99-PT-1636-M |
| | ) | |
| RENFRO CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

FEB 2 5 2000

## MEMORANDUM OPINION

This cause comes to be heard on defendant Renfro Corporation's ("defendant" or "Renfro") motion for summary judgment filed January 3, 2000. In her complaint, plaintiff Regina Taylor ("plaintiff" or "Taylor") asserts that Refro violated Title VII of the Civil Rights Act by terminating her employment in retaliation for her complaints of sexual harassment.[1]

### BACKGROUND

There are inconsistencies in the facts as reported by numerous witnesses between deposition testimony, affidavits, personal declarations, and EEOC documents. Because this case is presently before the court on a motion for summary judgment, it will review the facts in the light most favorable to the non-moving party. Any discrepancies between facts will be noted, bearing in mind that it is not this court's job to evaluate the credibility of witnesses. Unless otherwise noted, the facts come from plaintiff's deposition testimony.

---

[1] There is no separate sexual harassment claim.

1

Dekalb Knitting, a division of Fruit of the Loom ("Dekalb"), hired Taylor as a turn-sew operator in the knitting department of its sock mill in September of 1994.[2] Renfro purchased Dekalb around November, 1996.   Taylor was paid a base rate plus a production incentive rate per dozen pair of socks sewed.  She also, on occasion, worked as a creeler, stringing the yarn for the knitting machines in the plant.  She worked on the third shift, from 11 p.m. until 7 a.m., approximately five days a week.  She also worked overtime when she could, for a total of 60-70 hours per week.  Renfro terminated Taylor, on February 21, 1997, for the stated reason of her recounting socks.

Taylor's first supervisor at Dekalb was Harold Bell.  Harold Bell's supervisor was Steve Todd.  The plant manager was Mike Brown.  Billy Barber replaced Brown as the plant manager sometime around the time the plant changed hands from Dekalb to Renfro.  Tony Bennet later replaced Barber as the plant manager under Renfro.  There are two main departments within Renfro: the knitting department and the finishing department.  The knitting manager was Steve Todd.  The first shift, 7 a.m. to approximately 4 p.m., knitting supervisor was Jerral Ingle.  The third shift knitting supervisor, Taylor's supervisor, was David Richardson.  Richardson was promoted to this position sometime in 1995.  The third shift finishing supervisor was Don

---

[2] A turn-sew operator sews the toe seams in socks.  A turn-sew operator uses a machine with nine or ten tubes coming out of it which, using suction, suck the socks into and out of the tubes.  The turn-sew operator makes sure the socks are positioned correctly and checks to make sure the machine sews the toe seam correctly.  The socks are automatically counted in one of the tubes.  There are three types of these machines at the plant: regular cycle machines which sew socks 10-12 inches in length, or 6-8 inches in length;  machines which sew children socks, or minis; and tube sock machines.  Defendant's Response to Plaintiff's Second Interrogatories.  Taylor typically worked on a regular cycle machine.  Decision of Unemployment Compensation Claim.

Crocker.  Brett Sams was the personnel manager at Renfro for the entire duration of Taylor's employment.

Taylor asserts that Richardson made inappropriate comments to her and other female employees off and on for the entire time she worked at the plant with him as her supervisor.  It is partly because of this alleged ongoing harassment that she apparently has a difficult time remembering exactly when each event occurred.

Sometime around October or November of 1995, while the plant was still owned and operated by Dekalb, Taylor complained to Brown in Bennett's company, prior to Bennett becoming plant manager, during a casual plant function, that since Richardson had been promoted to third shift supervisor, he had been making "suggestive remarks."  Taylor did not state any specific remarks to Brown.  However, she testified in her deposition that these "suggestive remarks" included the following incident.  The fall of some year, probably 1995, Taylor was talking to Ruby Glasgow,[3] another employee, about how her husband hunts deer and how it tastes good if it is cooked correctly.  Richardson allegedly approached Taylor from behind and said, "You can eat my dear meat anytime," and then walked away.  Brown informed Taylor that Todd would eliminate the problem.

Taylor also complained to Billy Barber about Richardson sometime around February of 1996.  On this occasion, her car keys and some prescription pills had been removed from her purse while at work.[4]  She complained first to Richardson, and then to Barber.  Taylor felt that

---

[3] Ruby Glasgow changed her name at some point during these series of events to Ruby Zlater.  The court will refer to her as Ruby Glasgow.

[4] The keys and the prescription bottle were found the next day, but her pills were not.

Richardson had something to do with it and was doing it just to annoy or harass her.  Taylor's

husband, Steve, came to the plant that morning to bring her another set of keys.  While at the

plant, though in the parking lot, Steve spoke with Todd and Barber about Richardson's

harassment of his wife.  At this time, Taylor related the following event involving Richardson to

Barber and Todd.  One Halloween, probably in 1995, Ruby Glasgow wore a cat outfit and

Richardson made suggestive remarks about it to Glasgow.  Glasgow told this story to Taylor

after the fact, but Taylor did not witness it herself.[5]  Taylor remembers Barber reacting

defensively to the accusations made of Richardson, but agreeing to look into it.

Taylor recalls one night when she was creeling, she was cleaning the pipes that the socks

travel through.  In order to clean the pipes, she wrapped a grease rag around the pipe with her

hand and rubbed it up and down to get all the lint off which accumulates over time.  Richardson

allegedly approached her from behind and said that it looked like she could do a good hand job.[6]

Taylor does not remember when this comment was made, and does not recall reporting it to

anyone at her work.  Another night around June of 1996, when Taylor was creeling, she was on a

chair stringing yarn through a machine above her head.  Richardson allegedly made a comment

about how she looked good stretched out that way.

Sometime between late fall or winter of 1996-1997, Taylor wore a pair of pants to work

which were made out of parachute material.  When Taylor walked in them, they made quite a bit

---

[5] Felecia Phillips also wore a cat outfit for Halloween of 1996, and Richardson allegedly
made some remark about his liking her tail.

[6] In her EEOC intake questionnaire, Taylor stated, "[Richardson] told a knitter that she
looked like she could do a good hand job.  Her name is Rhonda Morgan."

of noise. Richardson allegedly approached her and told her that she was swishing sweetly in those pants. Around that same time, Richardson allegedly pulled Felecia Phillips', a female employee's, t-shirt off her shoulder in an attempt to get her attention, exposing her bra strap. Taylor did not actually witness the event, but Phillips told her about it. According to Taylor, Phillips was quite embarrassed about this event and cried, but wouldn't report the incident for fear of losing her job. According to Phillips, she felt embarrassed but did not cry, and did not consider it to be harassment.[7]

In October, 1996, Taylor was working during the first shift as a creeler. She allegedly had been in the shift supervisors' office with Richardson and Jerral Ingle present. Taylor went to look for a pencil in Ingle's desk, and Richardson allegedly asked her what she was doing in "Mr. Ingle's drawers" and to "stop playing in Ingle's drawers."[8]

Taylor spoke with Bennett in his office in late 1996, around October. Taylor told Bennett that inappropriate comments were being made by Richardson to herself and other female employees on the floor during the third shift. Taylor stated that several of the women were afraid to come forward with their complaints for fear of reprisal. It is not clear what was reported. According to Taylor's deposition testimony, she either related the above referenced events relating to the parachute pants and the t-shirt incident, or she related the Ingle's drawers

---

[7] Affidavit of Felecia Phillips, December 28, 1999.

[8] According to Richardson, Taylor was laughing at the time, saying, "I'm playing in Jerral's drawers!" Affidavit of David Richardson, February 18, 1999.

incident.[9]  Bennett responded that he would have Todd handle the situation.[10]  Todd did speak with Richardson and Ingle, and after getting their side of the story, advised them to be careful about the wording of their remarks to other employees.

Just before Christmas of 1996, a number of the women decided to get dressed up for the plant's holiday function.  Taylor wore a conservative red skirt suit.  Richardson allegedly told her that she could go from "cheap to chic" and look good either way, or looked good enough to eat.  Taylor did not report this incident.  Around January of 1997 (presumably, although the year is unclear), while Taylor was creeling, Richardson approached her from behind and brushed up against her with his pelvis.  Taylor turned around to face him and said, "Look, David, I'm a short, fat, ugly, married woman, why don't you just leave me the hell alone."  Richardson then turned around and walked away.

More generally, Richardson testified to the following in his deposition, taken November 11, 1999:

Q: And do you compliment your employees?

A: Yes.

Q: Do you compliment their looks?

A: There is occasion I have said that to people to try and encourage them.

Q: Do you compliment the looks of female employees?

---

[9] Bennett and Todd agree she reported only the Ingle's drawers incident.  EEOC Affidavit of Steve Todd, February 18, 1999; Bennett Depo, pp. 26-36.  But see Affidavit of Regina Taylor, February 22, 1999, stating she reported the swishing incident plus "all the other comments."

[10] Taylor stated in her deposition that she never brought complaints directly to Todd because she would feel very uncomfortable making these claims to him.

A: I have said it before.

Taylor was terminated on February 21, 1997. During her shift, Taylor had worked on the machine she usually used. After approximately 3 hours, Richardson moved her onto a different machine. Richardson asserts that he ordered the move because Renfro needed more of the shorter socks for an upcoming order, and also to leave some longer socks for the next shift to work on. Taylor asserts that Richardson ordered her to work on a different machine because he knew that she was unaccustomed to the other machine and that she would make a mistake for which he could fire her. Taylor testified in her deposition that the machine for the shorter socks was quicker than what she was accustomed to, and that she inadvertently sent socks which she had inspected through a tube which recounted them. On the machine which she was accustomed to, the same action would not result in the socks being recounted.

Sometime during the shift on the date of Taylor's termination, two other turn-sew operators, Donna Frasier and Janis Ward, saw Taylor re-feed socks through her machine, causing them to be recounted.[11] Frasier and Ward watched this for a few minutes to be sure of what they saw.[12] They both went to Richardson's office and reported Taylor's actions to him, knowing that recounting socks was falsifying production and was against company policy.[13] Richardson told

---

[11] EEOC Affidavit of Donna Frasier, February 18, 1999.

[12] Ward recalls that she had seen Taylor recount as many as 300 socks. Declaration of Janis Ward, October 29, 1999.

[13] "Infractions for the following rules will normally result in discharge for the first offense....
  37. Falsification of company records or documents, including the falsification of production or time records." Defendant's Exhibit 2, Renfro Guidelines. However, it appears from Bennett's deposition testimony that if the mistake was inadvertent, the employee might not

7

them that he needed to see her recounting socks before he could take any action. He then called the department manager Todd and told him what had been reported to him. Todd advised Richardson to go to the plant floor to see if he could observe Taylor recounting socks. Todd also advised Richardson to call the personnel manager, Sams, and discuss the situation with him. Sams informed Richardson that if Taylor was recounting socks it amounted to falsifying production.

Richardson went to the plant floor and watched Taylor for a few minutes. He observed Taylor recounting a few socks. He then returned to his office and contacted the finishing supervisor for the third shift, Crocker, and told him what was going on and asked him to come to his office and act as a witness to a meeting between himself and Taylor. Richardson then informed Taylor that he wanted to speak with her. Taylor, Crocker, and Richardson[14] met in the supervisor's office. Richardson informed Taylor that he and two other employees had observed her recounting socks. Taylor admitted that she had recounted some socks,[15] but stated that it was

_____

be terminated. Bennett Depo, pp. 61-66. Additionally, Richardson stated in his deposition:

Q: And that would be the only way that she would be terminated if she was doing it intentionally, correct?

A: Correct.

Richardson Depo, p. 109. See also Richardson Depo, pp. 147-52 (describing how new employees might recount socks when checking them because the socks can easily get sucked into the tube).

[14] Todd and Ingle may also have been present.

[15] Taylor states in her deposition that she inspected between 24-35 socks, and that was probably how many had been recounted.

inadvertent due to her unfamiliarity with the machine she was working on and her habit of rechecking socks in a particular way.[16] Richardson told her that she had been working as a turn-sew operator for a few years and that he found her explanation unconvincing given her experience. He also stated that, having watched her, it had not looked like she was rechecking socks. Richardson informed her that falsification of production records could result in her termination. He told her to return to her shift, and that he would discuss the matter with Todd.

Todd met with Richardson in Richardson's office, and Richardson informed Todd that he had observed Taylor recounting socks. Todd met with Ward and Frasier and obtained statements from them as to what they had observed. At 7 a.m., Richardson, Sams, and Todd discussed the situation. They told him that they didn't think it was likely that Taylor had inadvertently recounted socks. Based on this, they decided to terminate Taylor. This tentative decision was reviewed by Bennett who agreed with the decision. At the end of her shift at approximately 7:15 a.m., Richardson informed Taylor that she was being discharged for falsification of production. Todd and Ingle were present at the meeting. Taylor requested that her socks be weighed so that any difference between her inflated count and the actual number of socks she had sewn could be compared, and her wages adjusted accordingly. Todd denied this request. Taylor states that she was informed that if she had stolen or recounted even one sock, that that was a sufficient basis for termination. Todd informed her that she could discuss the matter separately with Sams or Bennett if she wished.

---

[16] This account was apparently believed by the Decisions on Unemployment Compensation Claim, April 15, 1997. During that hearing, Taylor stated, "It [was] the first time [I'd sewn short socks] since they've changed the way they do the inspection number and all."

9

Taylor went directly to Bennett's office to discuss the matter with him. Sams was also present during the conversation. She again requested a recount and weighing of the socks. They denied this request. They told her that if she had admitted to taking even one sock, that that justified her termination. Taylor told them that Richardson had been harassing her the entire time he had been her supervisor and asked them if she was being terminated for complaining that Richardson sexually harassed her. Bennett and Sams responded that her complaints[17] had no bearing on their decision to terminate her. Taylor also inquired as to who had reported her. Bennett and Sams refused to provide her with this information, in case she might retaliate against them. Neither Bennett nor Sams investigated whether Richardson had sexually harassed Taylor or any other employees.[18]

Taylor filed charges with the Equal Employment Opportunity Commission ("EEOC") office on March 10, 1997. In her intake questionnaire, Taylor reported that Richardson made "lewd and suggestive remarks" to herself and others; the deer meat comment; the "cheap to chic" comment; the t-shirt incident; the hand job comment to Rhonda Morgan; that Richardson told Taylor that he could "handle" her; and that she had asked him to stop. The EEOC conducted an investigation into Taylor's charges, and concluded that there was sufficient evidence to find that Renfro's termination of Taylor was a pretext for retaliation against her for her complaints against Richardson.[19]

---

[17] Whether Taylor made one complaint or more than one complaint is disputed. Because Taylor asserts multiple complaints, the court will use the plural. See Bennett Depo, p. 40.

[18] Bennett Depo, p. 74.

[19] EEOC Determination, April 2, 1999.

In sum, Taylor made what she considered to be three "formal" complaints of sexual harassment regarding Richardson. The first was in October, 1995, to Brown with Bennett present. The second was in January, 1996, to Barber in the parking lot with her husband, Steve, present. The third was in October, 1996, to Bennett in his office. Taylor alleges that she also made numerous "informal" complaints against Richardson when Bennett would be walking through the plant. On those occasions, Taylor would typically limit her complaint to something along the line of "the comments are still being made," or would ask if anything had been or would be done about the alleged continuing inappropriate comments. Taylor stated that these conversations were limited because there were many people on the floor who might overhear.

**DISCUSSION**

**A. Summary Judgment Standard**

Summary judgment may be granted based upon facts developed during the administrative proceedings, the pleadings, discovery, and supplemental affidavits if together, they show that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. Id. The non-moving party then bears the burden of showing that there are specific facts demonstrating that there is a genuine issue of fact for trial. Id. at 324. The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987).

11

**B. Title VII**

The shifting burden of production in Title VII cases is well established.  See generally

McDonnell Douglas v. Green, 411 U.S. 792 (1973); Texas Dept. of Community Affairs v.

Burdine, 450 U.S. 248 (1981).  The plaintiff must first establish a prima facie case of retaliation.

See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997)

(ADA retaliatory discharge claim at issue, but test based on Title VII); EEOC v. Reichhold

Chemicals, Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  After a prima facie case is

established, the burden of production then shifts to the defendant employer to present legitimate

non-discriminatory reasons for its actions.  See id.  The plaintiff must then demonstrate that the

employer's proffered non-discriminatory reasons are a pretext for retaliation.  See id.  While the

burden of production shifts between the parties, the burden of persuasion remains with the

plaintiff.  See Reichhold, 988 F.2d at 1572.

**1. Plaintiff's Prima Facie Case**

Section 703(a)(1) of Title VII states in pertinent part:

(a) It shall be an unlawful employment practice for an employer–
(1) To fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race, color,
religion, sex, or national origin....

42 U.S.C. § 2000e-2(a)(1).

There are two clauses of Title VII regarding retaliation.  Section 704(a) of
Title VII, 42 U.S.C. § 2000e-3(a), provides protection against retaliation from
employees who oppose unlawful employment practices committed by an
employer and for employees who participate in Title VII proceedings:

It shall be an unlawful employment practice for an employer to
discriminate against any of his employees or applicants for

12

> employment ... because he has opposed any practice and made an
> unlawful employment practice by this title, or because he has made a
> charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this Title.

Aldridge v. Tougaloo College, 847 F. Supp. 480, 483 (S.D. Miss. 1994). These two clauses are

commonly referred to as the opposition clause and the participation clause repectively. See

Clover v. Total System Services, Inc., 176 F.3d 1346, 1350 (11th Cir. 1999). Under the facts as

alleged in this case, it is clear that the opposition clause is relevant, as Taylor opposed the

practices of Richardson.[20] However, the participation clause is not at issue, as Taylor did not

instigate or participate in any proceeding, internal or otherwise, based upon her grievance. See

Aldridge, 847 F. Supp. at 483.

To establish a prima facie case of retaliation under the opposition clause of Title VII, the

plaintiff must demonstrate (1) that she engaged in statutorily protected activity; (2) that she

suffered an adverse employment action; and (3) that the adverse employment action was causally

related to the protected activity. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385,

1388 (11th Cir. 1998). Because it is undisputed that plaintiff suffered an adverse employment

action, the court will discuss the two remaining prongs of the prima facie case.

### a. Statutorily Protected Activity

Defendant contends that plaintiff's complaints to Brown in the fall of 1995, to Barber in

the spring of 1996, and to Bennett in October of 1996, do not qualify as "protected activity" as

required by the statute. Specifically, defendant contends that plaintiff's first complaint of

"suggestive" comments was too vague to put her employer (at the time, Dekalb) on notice that

---

[20] The EEOC Determination report also referred to her complaint as an opposition.

13

her complaint was of some type of inappropriate sexual behavior.  Defendant also asserts that,

taken as true, all of plaintiff's complaints together do not amount to a legally redressable hostile

environment claim.  Furthermore, defendant asserts that even if plaintiff subjectively believed the

environment to be hostile, no objective and reasonable person in her position could have reached

the same conclusion.

Plaintiff argues that her claims need not amount to a legally redressable hostile

environment claim for a retaliation claim.  Rather, she needed only honestly believe that she was

a victim of a sexually hostile environment, and that a reasonable person in her position would

agree with her assessment of the situation.

> A plaintiff engages in "statutorily protected activity" when he or she
> protests an employer's conduct which is actually lawful, so long as he or she
> demonstrates "a good faith, reasonable belief that the employer was engaged in
> unlawful employment practices." Little v. United Technologies, Carrier
> Transicold Division, 103 F.3d 956, 960 (11th Cir. 1997).  However, it is
> insufficient for a plaintiff "to allege [her] belief in this regard was honest and bona
> fide; the allegations and record must also indicate that the belief, though perhaps
> mistaken, was objectively reasonable." Id.

Harper, 139 F.3d at 1388.  "The objective reasonableness of an employee's belief that her

employer has engaged in an unlawful employment practice must be measured against existing

substantive law." Clover, 176 F.3d at 1351.

In Coutu v. Martin County Bd. of County Commissioners, 47 F.3d 1068, 1074 (11th Cir.

1995), the Eleventh Circuit held that a filed grievance did not amount to statutorily protected

activity where the written grievance contained a conclusory allegation of racial discrimination,

but during the hearing, the plaintiff made no allegation and offered no proof of race or national

origin discrimination.  The court concluded that unfair treatment alone does not qualify as an

14

unlawful employment practice under Title VII, absent evidence of discrimination based on some unlawful category.

In <u>Harper</u>, 139 F.3d at 1388, the Eleventh Circuit noted that the reasonableness of a plaintiff's belief is measured in part by the stance of courts on the issue. In that case, the plaintiff complained that the defendant's grooming policy which prohibited males, but not females, from wearing their hair long, discriminated on the basis of gender. The court recognized that every federal circuit to decide the issue, including the Eleventh, agreed that grooming policies similar to the one at issue are not unlawfully discriminatory. Thus, plaintiff's belief that the defendant's grooming policy was discriminatory was not reasonable.

In <u>Clover</u>, 176 F.3d at 1351-52, the plaintiff complained of a hostile environment where an older assistant vice president frequently visited a seventeen year old high school student employee without any business purpose, would call the high school employee on her personal beeper during work hours, and would flirt with the high school employee. The court held that the disparity between the two employees' ages did not make Clover's belief objectively reasonable, and that the conduct complained of missed the mark of actionable sexual harassment "by a country mile." The court cautioned that, in retaliation claims, the conduct complained of need not be sexual harassment per se, but that "it must be close enough to support an objectively reasonable belief that it is."

In <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1454-55 (11th Cir. 1998), the Eleventh Circuit held that, viewing the facts in the light most favorable to the plaintiff, the plaintiff had a good faith, reasonable basis for filing her EEOC charge of discrimination on the

15

basis of race.[21]  During the trial, the plaintiff testified that her manager had told her that the

position at issue would not be filled by a black person.  The court decided that the district court

erred in concluding that the plaintiff had failed to establish a prima facie claim of retaliation

because her EEOC charge of racial discrimination was not objectively reasonable.  Rather, the

court held that, accepting the plaintiff's testimony as true and viewing it in the light most

favorable to her, her testimony would lead to a good faith, reasonable basis for filing an EEOC

charge of racial discrimination.

In Mortenson v. City of Oldsmar, 54 F. Supp. 2d 1118, 1124 (M.D. Fla. 1999), the

defendant did not contest that the plaintiff's complaint of sexual harassment was statutorily

protected activity.  In that case, the plaintiff alleged that, while at work, she was subjected to

unwelcome sexual advances by a City Council member; heard sexist comments, such as "babe,"

"honey," "mistress," and "sweetie;" and experienced offensive unwelcome touching, such as

flirting, putting his arm around her at work, and kissing her directly on the lips.

In Aldridge, 847 F. Supp. at 484-86, the district court found no statutorily protected

activity where the plaintiff claimed in her EEOC charge that her grievance letter was in

opposition to alleged sex discrimination, but her grievance letter made no mention of sex

discrimination, nor did it suggest that the selection of a male for the position at issue was the

result of sex discrimination.  Rather, the grievance letter discussed insensitive behavior,

evasiveness, and feelings of intimidation.  The court held that, even viewed in the light most

favorable to the plaintiff, the grievance letter could not support a reasonable inference that the

---

[21] The court declined to address the issue of whether, in participation clause claims in
addition to opposition clause claims, a showing of good faith and reasonable basis is required.

16

plaintiff believed that the defendant was engaged in any impermissible employment practice.

In this case, viewing the facts in the light most favorable to the plaintiff, Taylor made three "formal" complaints regarding Richardson's behavior.  In the fall of 1995, Taylor complained to Brown in Bennett's company that since Richardson had been promoted to third shift supervisor, he had been making "suggestive remarks," but did not relate any specific remarks or clarify what she meant by "suggestive."  Around February of 1996, Taylor complained to Barber, in the plant's parking lot with her husband present, that Richardson allegedly made suggestive remarks to Ruby Glasgow regarding her Halloween costume.  Around October of 1996, Taylor complained to Bennett in his office that Richardson was making inappropriate comments to herself and other females on the floor, including the "Ingle's drawers" incident.  Taylor also allegedly made numerous "informal" follow-up complaints to Bennett when he was on the plant floor.[22]  Taylor has also testified to the following specific incidents which contributed to her belief of sexual harassment or a hostile working environment: (1) the deer meat comment; (2) the stolen car keys and prescription incident; (3) the cat outfit comment; (4) the hand job comment; (5) the stretched out comment; (6) the swishing sweetly comment; (7) the t-shirt incident; (8) the Ingle's drawers incident; (9) the "cheap to chic" comment; and (10) the pelvis brushing incident.

Renfro contends that it was not on notice of any sexual harassment or a hostile environment because Taylor never used the word "sex" or "sexual" in her complaints to management.  Rather, Taylor complained of "suggestive" or "inappropriate" remarks, or that

---

[22] This court makes no determination as to what constitutes a "formal" or "informal" complaint, or whether any distinction between the two is legally significant in a retaliation claim.

some remarks made by Richardson made her feel "uncomfortable."  Bennett stated the following

in his deposition:

> Q: What if a female employee comes up and says I believe a supervisor is making statements that embarrass me, that make me feel uncomfortable, and those statements have sexual overtones, would you consider that a sexual harassment complaint?
>
> A: If the employee said they contained sexual overtones, yes, I would.
>
> Q: So if they don't say they have sexual overtones, they don't use those words, then you wouldn't consider it to be sexual harassment?
>
> ...
>
> A: I would take it as a complaint and follow up on it.
>
> Q: You would not take it as a sexual harassment complaint, though, would you?
>
> A: No, sir.
>
> ...
>
> Q: Did you ask – let's be more specific.  Ms. Taylor came to you and said words to the effect that David Richardson had made some statement about her looking through Gerald's [sic] drawers and that made her embarrassed and uncomfortable. Do you recall that?
>
> A: That is not what she told me.
>
> ...
>
> Q: Tell me what she told you.
>
> A: She was working over on first shift that morning.  She said she was going through Gerald's [sic] desk drawers hunting a pen to write down her line she was going to creel.  She told Gerald [sic], said I'm not playing in your drawers, and David said what are you doing in Gerald's [sic] drawers anyway.
>
> Q: And she told you she felt embarrassed by that statement, didn't she?
>
> A: Yes, she did.

18

...

Q: ... Did you or did you not consider those statement to have any sexual overtones?

A: No, sir.[23]

Bennett reported Taylor's complaint to Todd for Todd to investigate. In his affidavit, Richardson states the following: "A week or two later, Department Manager Steve Todd told Mr. Ingle and me that Ms. Taylor had commented to Plant Manager Tony Bennett that I had made a sexual comment. He told us that she had mentioned the comment I had made about 'Jerral's drawers.'" (emphasis added). In Steve Todd's affidavit, Todd states the following: "Mr Bennett stated that such comments were unacceptable, even when joking, and asked me to investigate the matter." (emphasis added). Based on these statements, it appears that Renfro was on notice, or should have been on notice, of potential sexual harassment, despite the fact that Taylor did not use the term "sexual" in her complaint. At the least, viewing the facts in the light most favorable to the plaintiff, it was reasonable for her to believe that Renfro had been notified of the problem.

The more important issue at this stage is whether Taylor had a good faith, reasonable belief that Renfro was engaging in unlawful employment practices. "Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). The Eleventh Circuit recently stated:

---

[23] Bennett Depo, pp. 19-28. See also Bennett Depo, pp. 49-50 (testifying that, even though Taylor told him she felt uncomfortable because there were two men in the office and she was the only woman present, he did not think that there was a sexual or gender component to her complaint).

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. Harris, 510 U.S. at 21-22, 114 S.Ct. 367. The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. Id. The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim ... subjectively perceive[s] ... to be abusive." Id. at 21, 114 S.Ct. 367.

Id. at 1246. Whether or not a work environment is hostile is determined by looking at the totality of circumstances, including but not limited to, the frequency of the conduct, its severity, whether it is physically threatening or humiliating or merely offensive, whether it unreasonably interferes with an employee's work performance, and whether the employee's psychological well-being is effected. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). "Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal 'civility code.'" Id. at 1245 (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Meritor, 447 U.S. at 67)).

Whether or not a work environment is objectively hostile or abusive is a question often left for the finder of fact. See, e.g., Green v. Servicemaster Co., 66 F. Supp. 2d 1003 (N.D. Iowa 1999) (motion for summary judgment on sexual harassment claim denied where, accepting the statements of the plaintiff as true, the defendant repeatedly directed crude remarks toward the plaintiff, made remarks about her breasts, and promised to "knock [her] ass into her cleaning bucket"); Franklin v. King Lincoln-Mercury-Suzuki, Inc., 51 F. Supp. 2d 661 (D. Md. 1999) (motion for summary judgment on hostile work environment claim denied where a barrage of sexual comments and conduct over the course of a month directed toward extremely religious woman); Newtown v. Shell Oil Co., 52 F. Supp. 2d 366 (D. Conn. 1999) (motion for summary

judgment on hostile environment sexual harassment claim denied where plaintiff subjected to two incidents of offensive name-calling, and was frequently referred to as a "woman" in a derogatory manner), 74 F. Supp. 2d 160 (jury found in favor of plaintiff), 2000 WL 49357 (defendant's motion for judgment as a matter of law denied); Morgan v. Fellini's Pizza, Inc., 64 F. Supp. 2d 1304 (motion for summary judgment denied on sexual harassment claim where plaintiff asserted she was subjected to repeated lewd and vulgar requests, comments, and gestures directed at her personally over a period of approximately one month); Swanson v. Civil Air Patrol, 37 F. Supp. 2d 1312 (M.D. Ala. 1998) (motion for summary judgment denied on sexual harassment retaliation claim where defendant made sexual advances toward plaintiff, and plaintiff claimed the investigation into her complaint was unsatisfactory, even though the court granted the defendant's motion for summary judgment on the plaintiff's hostile environment sexual harassment claim).

However, motions for summary judgment on retaliation claims or sexual harassment/hostile environment claims are granted when, even viewing the facts in the light most favorable to the plaintiff, no reasonable person could conclude that plaintiff's claims amounted to redressable discrimination. See, e.g., Francis v. Board of School Commissioners of Baltimore City, 32 F. Supp. 2d 316 (D. Md. 1999) (motion granted where plaintiff failed to show that she psychologically or professionally suffered where plaintiff allegedly refused the sexual advances of defendant, defendant commented on her body on one occasion, and defendant squeezed her waist on one occasion); Darland v. Staffing Resources, Inc., 41 F. Supp. 2d 635 (N.D. Texas 1999) (motion granted where employee who harassed plaintiff employee on one occasion not during work hours while not on work property, harassing employee was fired the next day, and

21

plaintiff failed drug test); Blough v. Hawkins Market, Inc., 51 F. Supp. 2d 858 (N.D. Ohio 1999) (motion granted where four incidents over the course of nine months, which may not have even been directed at plaintiff, occurred); Blevins v. Heilig-Mayers Corp., 52 F. Supp. 2d 1337 (M.D. Ala. 1998) (motion granted where defendant generally angry and disagreeable, using foul language, and no evidence that the plaintiff could have reasonably believed that the defendant's behavior was focused on women).

In this case, plaintiff has testified to ten specific incidents which occurred over the course of a little over one year. She has also testified that Richardson frequently made inappropriate comments to herself and others on the floor. She testified that she made three formal complaints to management about Richardson's behavior, and that Richardson's behavior did not change. She testified that she made numerous informal complaints to Bennett while he was on the plant floor regarding Richardson's behavior. The subjective component is clearly met as Taylor believed that her work environment was hostile or abusive, as evidenced by her complaints to management. The objective component has also been met, considering the fact that a plaintiff in a retaliation claim does not need to prove that the conduct was per se illegal, and that a reasonable trier of fact could arguably conclude that the environment was hostile or abusive. Thus, the first prong of plaintiff's prima facie case has been satisfied.

### b. Causal Relationship

Defendant asserts that plaintiff cannot establish that the adverse employment action was causally related to the protected activity. Defendant argues two main points: (1) that because four months passed from the time of her complaint to the time of her termination, no inference of causation can be made; and (2) that plaintiff admits that she recounted two to three dozen socks

in violation of company policy.

Plaintiff asserts that the temporal element is merely one factor to be considered, but that the more important question is whether a retaliatory motive was a substantial factor in Renfro's decision to terminate her. Plaintiff argues it was, as evidenced by her October, 1996, complaint to Bennett, the fact that Richardson was aware of Taylor's complaints, and the fact that Richardson fired Taylor after becoming aware of the complaint.

The Eleventh Circuit "interpret[s] 'the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Meeks v. Computer Assoc. International, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting Reichhold, 988 F.2d at 1564). The Eleventh Circuit also does "not construe the 'causal link' ... to be the sort of logical connection that would justify a prescription that the protected [activity] in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985). And while not a per se requirement, courts do consider the amount of time lapsed between the time of the complaint and the time of the adverse employment action. See Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1556 (11th Cir. 1995); Maniccia v. Brown, 171 F.3d 1364, 1369-70 (11th Cir. 1999).

A causal link has been found sufficient to withstand a defendant's motion for summary judgement, for example, where an employer discovered an employee's EEOC charge and a series of adverse employment actions commenced almost immediately, Wideman, 141 F.3d at 1457; where a supervisor was displeased with a HEW investigation and associated the employee who suffered adverse employment action with the investigation, Simmons, 757 F.2d at 1189; and

23

where a plaintiff complained of sexual harassment in June, 1995, was terminated in April, 1997, and the plaintiff's performance evaluations for her 18 years of employment had been favorable, Mortenson, 54 F. Supp. 2d at 1124-25.

A causal link has not been found, for example, where the plaintiff failed a test and passing the test was necessary for being offered the job at issue, Fleming v. Boeing Co., 120 F.3d 242, 248 (11th Cir. 1997); where the adverse employment action occurred 15 and 21 months, respectively, after the plaintiff filed a grievance against her employer, Maniccia, 171 F.3d at 1370-71 ("The only causal connection established by the evidence is between Appellant's misconduct and her termination."); where the plaintiff failed to complete necessary management tasks, had a poor working relationship, and refused to accept constructive criticism, Coutu, 47 F.3d at 1074-75; where the time lapse between plaintiff's complaint and her termination was 16 months, Aldridge, 847 F. Supp. at 486; and where plaintiff's complaint was thoroughly investigated, a detailed report was filed concerning the investigation, the subject of the complaint was sanctioned, strenuous efforts were made to put plaintiff into another position within the company, and plaintiff was ultimately terminated six months after her complaint was filed, Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1555 (11th Cir. 1997).

In this case, plaintiff was terminated approximately four months after her last formal complaint regarding Richardson's conduct. The ensuing investigation consisted of Todd asking Richardson and Ingle what had happened (but did not include asking plaintiff what had happened), and cautioning Richardson and Ingle to not say things which might be misinterpreted by other employees. She was terminated for recounting socks in violation of company policy. She admitted to recounting socks, but claimed it was inadvertent. Viewing the situation in the

24

light most favorable to the plaintiff, she made three "formal" complaints, and she allegedly made numerous "informal" complaints up to January of 1997, one month prior to her termination. Her work record prior to February 21, 1997, had been unblemished. Richardson characterized her as a very good worker.[24] Richardson was also aware that Taylor had complained to Bennett about his conduct.[25] She was terminated on her first mistake, despite the fact that she admitted the error and gave an explanation for it. Based on this, it does not appear that the employment action and plaintiff's complaints were wholly unrelated. Thus, plaintiff has satisfied the third prong.

### 2. Defendant's Reason for Termination

Renfro has offered a legitimate non-discriminatory reason for it's discharge of Taylor: she recounted socks in violation of company policy which allows for termination of an employee on the first offense.

### 3. Pretext

Plaintiff next has the burden of showing that Renfro's legitimate non-discriminatory reason is a pretext for retaliation. Plaintiff argues that pretext can be proven with facts which point to enough evidence to permit a reasonable jury to reason that the defendant's articulated reasons for its actions are untrue. It is plaintiff's contention that Richardson moved her onto the machine where she was found recounting socks specifically because she was less familiar with it and, thus, more likely to make a mistake potentially leading to her termination. Additionally, plaintiff calls this court's attention to cases which state that while some deference is due to be

---

[24] Richardson Depo, p. 115.

[25] Richardson Depo, p. 133.

given to management decisions, the less sensible an employer's decision appears, the more likely a factfinder will find it unworthy of credence.  See Combs v. Plantation Patterns, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997); Artis v. Hitachi Zosen Clearing Inc., 967 F.2d 1132, 1140 (7th Cir. 1992); DeMarco v. Holy Cross High School, 4 F.3d 166, 171 (2d Cir. 1993).  Plaintiff argues that an employer's decision to terminate an employee on her first mistake, with no prior warning, and where the employee has a plausible explanation for the mistake, is due little credence.

Defendant argues that, assuming plaintiff has satisfied her prima facie case, she cannot rebut Renfro's proffered reason for her discharge.  Renfro bases this assertion on the fact that it is undisputed that plaintiff violated company policy and was sanctioned within the official company guidelines.  Defendant argues that this basis is bolstered by the fact that Richardson remained ignorant of plaintiff's actions that evening until two impartial employees reported plaintiff to him.  Furthermore, defendant asserts that no other employee who engaged in comparable conduct has been treated more favorably than Taylor.[26]

The Eleventh Circuit has discussed the issue thusly:

> In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case.  Miller [v. Fairchild Industries, Inc., 797 F.2d 727, 732 (9th Cir. 1986)].  Evidence already introduced to establish the prima facie case may be considered, and "[i]ndeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation" and establish pretext.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 n.10, 101 S.Ct. 1089, 1095 n.10, 67 L.Ed.2d 207 (1981).  Accordingly, the grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title

---

[26] Joyce Jackson and Tonya Battles have been discharged for violations of #37 regarding either falsification or attempted falsification of production records.  Defendant's Responses to Plaintiff's First Interrogatories.

VII cases in which the plaintiff has established a prima facie case because of the "elusive factual question" of intentional discrimination. Id. at 256, 101 S.Ct. at 1095.

Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 921 (11th Cir. 1993). The court,

viewing the facts in the light most favorable to the plaintiff, sees that a reasonable trier of fact

could agree with the plaintiff's version of the story. The EEOC has so determined.[27]

## C. Conclusion

Based upon the foregoing, defendant's motion for summary judgment will be denied.

The case is close, but close cases are for triers of fact.

This α day of February, 2000.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[27] There may be an issue as to whether the EEOC determination is admissible at trial. This may depend on the scope of its investigation.